Good morning, Your Honors. May it please the Court, my name is Jennifer Chow on behalf of Appellant Lonnie Williams. I'm a third-year student at the UCLA School of Law. Welcome. Thank you. Welcome. Good to have you here. Thank you. Good to be here. This Court has specifically asked us to address whether a nexus must exist between the merits of a plaintiff-prisoner's case and her alleged imminent danger under the three strikes rule to the PLRA. Ms. Williams satisfies a nexus requirement because her allegations of imminent danger are clearly traceable to defendant's actions at issue in this case. Furthermore, the plain language of the PLRA and policy considerations require that imminent danger under the PLRA be a one-time determination that lasts throughout the course of an inmate's case, including all appeals. We have three textual arguments and two policy arguments to support this reading of the PLRA. The first textual argument is based on 28 U.S.C. section 1915G of the PLRA, which governs the three strikes rule. And if Your Honors would like to follow along that language. Let me just ask you one question first. Sure. I think I understood your argument so far. It's that the nexus exists between the imminent danger on appeal and the imminent danger at the original complaint stage. The second argument I understand you to be making, and this one I'm not sure about, is that you only need one imminent danger determination, and therefore you don't need a second one at the court of appeals. Are those your two arguments, and are they separate, or where are we? No, we're saying that she meets a nexus requirement because the nexus and imminent danger should be a one-time determination, Your Honor. At the time of the filing? At the time of the filing, that's correct. At the time of the filing, yeah. At the time of the filing or at the time that she first applied for informed apoperous status under the PLRA. So then you don't need an – well, I guess you're saying that's one argument you don't need to show – well, okay, go ahead. Your basic argument is that if you've established an imminent danger once at the time of filing, then you don't have to establish it again at the court of appeals? Yes, Your Honor, that's our argument. But then you also say there is a nexus between the danger at the time of the court of appeals and the danger originally in the district court. Well, Your Honor, the nexus requirement, I believe, asks us to look at the traceability of the relationship between the imminent danger alleged and the actual claims. Right, I think there's two questions embedded in that. So in other words, if it's your position that at the time that she filed the lawsuit in the district court, she has to establish nexus between the claims and imminent danger, are you saying that once that's established, even if the situation arguably changed by the time the case gets to the court of appeals, we don't revisit that question again? Yes. The only reason that comes up is because given the transfer now, there's an argument, potentially an argument, that the nexus requirement has been weakened substantially. So is it your position that we don't even need to get there? Because once you demonstrate a nexus between imminent danger and the claims in the complaint in the district court, that determination's been made, and then the plaintiff essentially gets to proceed through the court system to the court of appeals without having to demonstrate that nexus again. Yes, Your Honor, that's exactly our argument. Otherwise, the jailer could just postpone having to deal with the issue so long as they transfer the prisoner to another institution. Exactly, Your Honor. And this also doesn't even guarantee that the prisoner would be removed from imminent danger, as we see in this case. Well, that's what I was saying. You have two separate arguments, it seems to me, from what you're saying, but I want to get them straight so that we can consider each separately. Your first argument was once you've established it in the trial court, that's the end. You can go through up to the Supreme Court, wherever you want to go, having established it once. The second argument, which I think you're also making, is that if you have to establish it again, all you have to show is some connection between what's happening to you now and your original complaint. Yes. Those are two separate arguments. Yes. Okay. And we believe that the one-time determination argument is supported by a reading of 28 U.S.C. section 1915A, which states that any court may authorize the commencement, prosecution, or defense of any suit, action, or proceeding in form of papyrus. And because suit, action, or proceeding has traditionally been read to include a case throughout its lifetime, including all appeals, 1915A actually authorizes in form of papyrus to last throughout an inmate's entire case. And the later reference to appeals therein also bolsters this argument because Congress has chosen to use the word therein rather than thereof. And I apologize, Your Honor, I should have mentioned this in advance, but I will be addressing the in form of papyrus issue, and my colleagues, Streff and Falvo, will be addressing issues of exhaustion. So let's get to your second argument of traceability. So assuming that your clients established a nexus at the complaint, assuming we agree that that's it, a one-time determination that doesn't get revisited again, now you wanted to talk about traceability? Yes. So assuming that we look at in form of papyrus and imminent danger at the time the complaint was filed, our client alleged her imminent danger stemmed from the fact that prison officials were telling other inmates that she was supposedly a And when she sought protection from the defendants in this case, the defendants refused to protect her, and that is the Eighth Amendment violation at issue in this case. Okay. Then she gets transferred to another prison. Yes. And there she has an allegation that that is connected to discrimination against her, is traceable to what occurred at the first prison. Yes, Your Honor. Okay. Her – the imminent danger she alleged at the appeal stage was that the defendants in the first facility were continuing to spread rumors, and those rumors reached her second facility, at which point the inmates at her second facility began to also threaten her. Okay. Did they put an R on her file? Yes. Okay. Okay. Now, you want to give some – half your time to the – your colleague? Yes, I would. Okay. Thank you, Your Honor. Stress and follow. So I'm going to address – Are you a student or a professor? Neither. A lawyer. Oh, okay. Well, that's not as good as either, is it? Yeah, not as much fun. So I'll talk about exhaustion and also the Albino case, and since you asked us to brief that. And in my limited time, I think I'll talk about Albino first, because I think what has to happen now is, because the wrong standard was used below, that the case needs to be remanded to the district court, and then the defendants can either ask for summary judgment or not. If they make a summary judgment motion, presumably there'll be some discovery that Ms. Williams can avail herself of. Well, do we have to remand her? Well, I think you do, because I think they used – I think the court below used the wrong standard. Admittedly, Albino came down after the court's decision, so they didn't understand this. But what Albino makes clear is that the proper motion should be a summary judgment one, and with all the inferences going in favor of the non-movement, Ms. Williams. And I think it's fairly clear it didn't happen here, since Ms. Williams said under oath that she tried to submit a grievance and Officer Cott refused to take it, therefore making – You make clear there's a record below that at least shows a genuine dispute, which would make summary judgment inappropriate. I think that there seems to be a genuine dispute. The only way there may not be one would actually suggest that summary judgment should go for Ms. Williams, because all the defendants here have done is produce affidavits saying we looked in the prison system and we didn't see any grievances filed. Well, of course it wasn't filed. Officer Cobb wouldn't allow it to be filed. And there's actually a case very much like this, using a summary judgment standard, that the defendants cite on page – Weren't there declarations denying that anyone refused her submission? I – they – the declarations say we checked the system, there was nothing there. They assume from that that nothing was submitted. But the declarants certainly don't know that. They work basically in the computer system in law grievances. I mean, given the volume of complaints that were documented, it just doesn't make sense that this one complaint – and the complaints that were documented in Exception 5 just ranged from one complaint to another, all kinds of complaints. So I – it's hard to see why this one complaint wouldn't be documented, would be refused. Well, we can only speculate. And, of course, the speculation should go in Ms. Williams' favor. But one thing could be is that Officer Cobb had received a bunch of these complaints and he just said, enough, Williams, I'm not going to take another one. There is – the Ninth Circuit dealt with a situation similar to this in Hubbard, actually, which is a case we cite. And the court asked, well, a bunch of other grievances have been filed. Why not – you know, doesn't that suggest this one wasn't? And the court says it's equally plausible that the fact that in that case Hubbard, here Williams, knew how to file these grievances. But I think even under your own argument, at best there would be a dispute as to whether there was any refusal to accept her complaint. If there is a dispute, then under the Albino standard, it should be remanded and summary judgment would be presumably denied. And then the court, following Albino, will have a preliminary hearing in which it can determine whether – it can assess Ms. Williams' credibility and decide whether she actually attempted and was prevented from filing her grievance. That's what Albino says to do. It says you can have a summary judgment and if you either – if that's either denied or a motion is not made for it, then the court has a preliminary hearing, presumably a kind of evidentiary hearing. And I would suggest that following Hubbard and the cases cited therein, that they would actually have to hear Ms. Williams out because she hasn't said anything contradictory that – there's nothing in the record that allows one to conclude just from the paper record that she's probably not telling the truth. And that's exactly what the Hubbard court did. And it cited Earp v. Ornosky for the proposition that except in very rare circumstances, when you've got a paper record like this, you actually have to have a hearing so that you can see and hear and assess the credibility of the prisoner. What about the fact that there were different levels of review and there doesn't seem to be any dispute that she's failed to avail herself of those additional avenues of appeal? Well, I believe that she was not required to. So under SAP, which we also cite, you're only required to exhaust available prison administrative remedies. They were not available to her. The officer, Cobb, according to Ms. Williams' testimony, refused to accept the grievance. He rejected it and refused to allow her to file it. So I believe that – and by the way, receiving no response, Ms. Williams was not actually even allowed to pursue – move up to the second level of review because that requires that you be appealing a decision or you were dissatisfied with the response in the first level that you got. So your argument is that because she was blocked at the first level, she didn't have anything to take it to the second and third levels. She was not permitted under prison regulations, which is what the PRLA looks to, to proceed to the second or the third level. I should reserve my time if there are no further questions. What she's asking for in terms of relief is the removal of the R designation. That's how you construe the complaint. Is that right? Yes. I think – I mean, as you know, under Civil Pro – Rule of Civil Procedure 54C, it doesn't really matter what she's asking for because except for a default judgment, she should be granted the relief to which she's entitled even if the party didn't ask for it. And as we say in our briefs, it seems to me clear that what she wants to do is be protected from the threats caused by the rumors that she's a sex offender. She believed that removal of the R suffix would do that, but that's not really the relevant question. The relevant question is, is she titled to relief? Yes, it's to be protected from the other inmates who are threatening her. Let me ask you, what we're doing on this appeal, I understand, is only two issues. One, does she get formal popular status? And that was the first argument we heard. Second argument is, should the summary judgment grant or dismissal be reversed? If we said yes to that, you know, that sort of answers – we can either say yes on that issue. I don't know that summary judgment is really the right word for it. But on the record, your opponent lose on they shouldn't have dismissed it or they shouldn't have granted summary judgment on exhaustion. I don't know whether we have to say anything about the district court trying the exhaustion issue again or not, saying it was wrong. Let's assume those two things happen. Then we're through. And the merits of the case go back to the district court. I understand we're not considering here whether she's actually entitled to relief on the merits. That will go back to the district court. Right. I think in any of the scenarios, the case needs to be remanded. If it's back in the district court, presumably you don't need to decide the informer proper's issue, but you asked us to brief that. No, we do need to decide the former proper's issue here now, whether we can grant former proper's here. Yes, for here. So we're through with that issue, let's say. We've heard that. We rule – I'm not saying we're going to, but we rule for your opponent. She gets former proper's, and we've had a great deal of satisfaction resolving that terrible issue about whether somebody can get former proper's, who probably doesn't have any money anyway. Okay, so we resolve former proper's, and then we resolve your issue, which is either the district court was right or wrong, which is missing the case on exhaustion. If we say they were wrong in doing what they did, then it goes back to the district court. If the district court wants to hold another summary judgment hearing, it does whatever it wants on exhaustion. But that's not up to them. All we're saying would be they were wrong to dismiss on exhaustion. Correct. Then what kind of relief she gets or whether she gets any relief is not before us. That will be decided when it goes back to the district court. That is also correct. Okay, thank you. Thank you. Good morning, Your Honors, and may it please the Court. I'm Suzanne Antley, and I represent the defendants at Belize in this case. Ms. Williams is not entitled to informal proper status for this appeal. Did I state the issues correctly? I believe so, Your Honor. The issues before this Court today are whether Ms. Williams can get informal proper status for this appeal. And if you decide that she should, then you would decide the question of whether the district court properly dismissed her failure to exhaust. If you ruled in her favor. And if we say they didn't, then we just remand to the district court. Yes. Thank you. Ms. Williams is having to rely on the imminent danger exception because it's undisputed that she has a long history of burdening the federal courts with meritless litigation, having filed more than 70 federal lawsuits and appeals, many of which have been dismissed for reasons that count as strikes. So to get around that problem, she's alleged that she's in imminent danger. But the court should reject that claim because it's not only implausible on its face, but also there's no nexus between that claim and her lawsuit. Well, that's why we can't just take the fact that she's filed 70 complaints. You don't want us just to say, well, she's an individual who doesn't deserve formal proper status. You want us to establish a legal rule that will apply to lots of prisons. That's your issue here. You want us to say that the rule is she's got to establish a nexus. Well, the law is that in order for the imminent danger exception to apply, there must be a nexus between the claim to the end. What I'm saying is that the fact that she's somebody who's filed 70 cases and she's a terrible abuser of the system is not what you really want us to say here. You want us to say something that applies to thousands of people, but the rule is that you have to establish a nexus. So we ought to forget the fact that this case involves someone who has filed too many frivolous cases. Except to the extent that the imminent danger exception only comes into play with a person who has already been determined to be prohibited because of their previous litigation. As opposed to three strikes, not 70. Exactly. Yes, you're right, Your Honor. But here she's claiming to allow the imminent danger exception because of her ‑‑ she has to because of her previous litigation history. But shouldn't we be nice to our customers? What you should do, Your Honor, is look at her claim of imminent danger and reject it because, one, it's implausible on its face, and, two, there's no connection between the claim danger and the lawsuit. Now ‑‑ Do you concede that there was an adequate showing of imminent danger before the district court at the time of the filing of the complaint? No, we do not. Or is that also in dispute? We believe, first of all, that the court should not even look at that danger because what's at issue ‑‑ Well, and the reason why I ask that is because we could go one of several ways. One is to say, well, if you demonstrated a nexus at the time you filed your status, there's been a determination by a district judge that it's there, and so you have IFP status throughout, even if your situation changes a little bit, which is this scenario because of her transfer to another prison. And that's why I go back to whether you agree that the nexus requirement has been met at the time of the filing of the complaint. No, we do not agree. Because if we go with that rule, that's the end of the inquiry. Right. And the answer to that is, no, we do not agree. We believe that there was no nexus, even between that original danger alleged and the lawsuit. But more important than that is that this court should not be looking at that original danger. The court has its own separate filing fee, and under 1915A1, it has the authority to make a determination at the time of the commencement of the appeal whether the litigant is entitled to avoid paying the filing fees. And that determination includes looking at her litigation history and the imminent danger exception if that arises, which it has here. So the court should really only look at the danger that is alleged at the time of the commencement of the appeal. And here, there's no that one, the alleged danger at the time of the commencement of the appeal is implausible, and there's no nexus. But also, even if the court did look at that original danger, there's no nexus there either. And let me tell you why. To have a nexus, it's important to look at the purpose of the imminent danger exception. That's what the Second Circuit did in Pettus v. Morgenthau. The court there said that the purpose of the imminent danger exception is to provide the inmate with a safety valve. In other words, to provide them if they are really in danger with a way to alleviate that danger despite their previous litigation history. Well, for that purpose to be served, there has to be a nexus between the claim danger and the lawsuit. So for there to be a nexus, two elements have to be present. First, the conduct alleged in the lawsuit has to have something to do with the danger. And second, success on the lawsuit has to alleviate the danger. Well, neither of those elements is present here. The conduct alleged in the lawsuit was that the defendants conspired with county officials to place an R suffix on Ms. Williams' record. Well, the R suffix or any suffix is derived from prosecutorial county records and it designates the classification of the conviction offense. The R suffix indicates a sexual offense. She alleged that the defendants conspired with county officials to place that R suffix on her record. She also alleged that an officer, not a defendant in this case, told inmates at her prison then, R.J. Donovan State Prison, that she was a sex offender and those inmates began to threaten her life. Well, there's no connection between those allegations and the danger she alleges now, which is that inmates at California State Prison Sacramento are threatening her. There's no connection. There's no allegation. Does that R follow her to Sacramento? It does, but the danger alleged is that inmates threatened her based on what someone else told them. They don't see her records. And is there an allegation that false rumors were spread and those rumors followed her? Don't talk about these things? The allegation is that the defendants, and this is why the allegation is implausible, the defendants, a warden, an associate warden and a correctional counselor at R.J. Donovan State Correctional Facility in San Diego, contacted inmates in Sacramento and told them that Ms. Williams was a sex offender and those inmates began to threaten her. That's implausible on its face. This court said in Andrews v. Cervantes in footnote 11 that a court can just reject a claim of imminent danger outright if on its face it's implausible or fanciful. And other courts have said the same thing. For example, the Seventh Circuit said if it's conclusory or fantastic or delusional, if the claim arises. Why is that implausible? It's implausible because. We run across cases, you know, now and then, where people who work in the community know what it's like and know that if a person is a sex offender and is known to the population, that that person's life is in danger. It's implausible because, for one thing, the warden and associate warden and correctional counselor at R.J. Donovan have way more to do than supervising the inmates at R.J. Donovan than to be able to spend their time contacting inmates at another prison in Sacramento. And second, if they did that, they would have to go through the supervisory staff at Sacramento. In other words. Is it implausible that the officials at one prison communicate information to the prison, to the officials at the next? That's not the allegation, Your Honor. It's implausible because the allegation is that the defendants, officials at one prison, contacted inmates in Sacramento. But even if the court finds the allegation plausible, it still should reject the claim because the success on the merits of Ms. Williams' lawsuit would not correct the danger, would not fix the danger. The relief she asked for was removal of the R suffix from her records. It's an administrative act. It does not remove her from the danger. It does not change the reason why she alleges that the other inmates are threatening her. That would not fix the danger. So neither element. Was that R that was affixed to her file, was that there, you know, as soon as her conviction took place and just put the R on it? How does it get there in the first place? My understanding is that it's placed there by county officials at the time of the conviction and communicated to prison officials where the inmate is incarcerated and that that suffix was placed there based on county records. But the removal of it would not fix the danger. Yeah, but that's right on the cover of the file. I'm not sure where it appears on the file, but what I am sure of is that other inmates do not see other inmates' records. And that's not even an allegation in any event. You know, a lot of things are not supposed to happen in prison. You're not supposed to be able to get drugs. You're not supposed to be able to do a lot of other things. But it goes on all the time. That's true, but the allegation here is not that the other inmates saw the R suffix. The allegation is that they were told by an officer who wasn't even sued that Ms. Williams was a sex offender and they began to threaten her. So giving her the relief, even if she succeeded and got the relief she requested, that would not remove the danger that she's in, particularly the danger she's in now, which is not even connected with the allegations in the lawsuit. So either way, the court should reject the claim of imminent danger because it's implausible, or even if you find it plausible, because there is not the required nexus. The required nexus has to show a causal connection between the alleged conduct and the danger. There's none there. I remember cases when I was a trial judge where one never was there in my mind. A young woman, well-dressed, minority woman, was arrested. I'm not sure for what. It was not for a heinous crime. And put into the Women's County Jail and then brought for arraignment the next day. She was there maybe, I don't know, 10 hours. And she was raped. All kinds of things happened to her. Anyone would know, I think, if you took a person like that and put her into the jail. I'm talking about women, too, not with men. That person would have a hard time, heck of a time surviving that one night in the Women's County Jail. I remember when she was arraigned the next morning in the federal court. I never forgot that. Well, what we have to focus on here are the allegations that Ms. Williams has made. And those are — You know, we can't take our experience and toss it away, can we? You can't. And bad things happen. And then another thing that's got nothing to do with the outcome of this that bothers me is that I don't know why we — if it makes them feel better to go to the law library and work out a petition. They want to file it. So let them do it. The courts can deal with that. There's no big — I don't think — I never thought it was a big problem. And it's good therapy. It gives them something to do. You know, it's like that king they had in the Tower of London that finally wrote out a message on a silver plate and tossed it out the window. Do you remember that? I don't know about that. And someone — some friar picked it up and resulted in its rescue from the cruel king. But, you know, in the time we were really inundated — you know how that happened? By the hands of the attorney general of the United States. We used to get 800, perhaps, immigration cases a year. Then one morning, we got 8,000. 8,000. And I think we finally worked through it. See? Yeah. Ashcroft gave us that. It's — anyway. So we dealt with it. So — The important issue here is Ms. Williams' allegations. How much is the filing fee? I believe it's $350. I believe. That I'm not sure about. Yeah. But in any event — I thought it was $400. It may be. Yeah. And then these folks in jail, prison, where are they going to get the money to file that? The issue is that federal law provides a means for — Do you want to take a minute to talk about exhaustion? So you've got all these declarations on the one hand, and you've got her allegation on the other hand, I tried to submit the complaint, but I was refused. I forget which officer did that. I'm trying to convince you, but, you know, women are going to rule this country soon. You might be the next Attorney General. What? I'm not so sure. I'm positive. I'm positive. I think that's the only thing that's going to save us. We've got 20 senators now. Fine with me if we get 60. If we think there's a factual dispute, do we send you back? If you do, then that would be the proper course of action. But there is no factual dispute. Under Albino, there is no requirement of an evidentiary hearing, only if the facts are in dispute. Here they're not, and let me tell you why they're not. Under Albino, the court laid out the procedure. The defendant is required to come forward with some evidence that the grievance system was available to the plaintiff. The burden then shifts, the court said, to the plaintiff to come forward and show that it wasn't available. Here, the defendants put on substantial evidence that there was a system, other avenues of recourse. The regulations say. The regulations say. I know you have regulations, but what beyond the regulations? Beyond the regulations? Well, in Albino, for instance, we had questions about were the prisons informed as to the content of the regulations. I don't think there are any affidavits about that. Were they told where the forms were? Right. And here there's no question. There's ample evidence that Ms. Williams. What was the evidence that she was advised of the specific procedures to follow and given forms or access to forms? Well, there's no dispute about that, because the record shows, and if you look at the excerpts of the supplemental excerpts of the record, four pages, four pages of grievances that Ms. Williams filed. And even, and if you look at the excerpts of the record, pages around 59 and following, it shows that even right around the time that we're talking about in this case, she filed four grievances that were processed and five that were screened out. The defendants showed evidence that the system is that if a grievance is rejected, then it's returned to the inmate with an explanation of why it's being rejected. And the inmate is given a chance to correct that and resubmit it, or. Was it shown that in this case it was returned to her? No. That, well. She says they wouldn't take it, right? Well, right. And the thing about it is, if that's true, I mean, and the Court can even accept that as true, but even then it doesn't show that she didn't pursue the other avenues that were available to her, which are she could have, if it was returned to her and rejected, she could have resubmitted it, corrected, or she could have filed a grievance about the rejection of that. And under California Code of Regulation Title 15-3084.2D. That's pretty good. Thank you. I love you going to be next year. She could have. Are you from the South? I am. Thank you. Can you tell? Yeah. Texas. Very good. She could have taken. Well, she could have submitted the grievance that she attempted to submit that was allegedly rejected and that wasn't done in this case, right? Exactly. There were, the defendants put on evidence that there were several avenues of recourse available to her. They put on that evidence. Then under Albino, the burden shifted to her to come forward and say, even those avenues were closed down to me. Because here's the complaint that I tried to file that was rejected. Exactly. Or some other avenue. I tried to file another one and they rejected it. I've tried. And that's also implausible given the multitude of grievances that she filed. And she knew how the system worked. She had had numerous processed all the way through. She had had numerous rejected and screened out. She knew how the system worked. And under that evidence, her bald assertion that she tried to submit a grievance and it wasn't allowed simply does not rise to create an issue of fact about. It's a specific statement as to who she went to and what they told her. Two different people. And there's no denial in an affidavit by those two people. Well, and even if you. She says it's not true. Right. But even if you accept that it's true, it raises no inferences that could be made by a jury that she, that all the other avenues of recourse were shut down to her as well. And this court said that in Hansen v. United States, that if a non-moving party is going to oppose a motion for summary judgment just relying on their own affidavit and it's not supported by factual data, it doesn't create an issue of fact. And that's precisely what we have here. It depends on what type of thing. If there are two people who have a conversation and one says here's what happened and the other doesn't respond, that's a fairly clear, it seems to me, reason that there ought to be a response at the least. Well. At which point you could maybe credit one over the other. But when there is no response to the allegation that I did these specific things and you say, well, yeah, maybe you could have filed a grievance about a grievance. Well, I don't think that's what we can discuss later, whether that's a reason for a way to administer a system where you say, here's what you're supposed to do. The person says, I did it. Well, I don't think that's what we can discuss later, whether that's a reason for a way to administer a system where you say, well, yeah, maybe you could have filed a grievance about a grievance. Now, we do know in her declaration that Ms. Williams knew what the system was, that she exercised it. Did she show that on prior occasions they had improperly rejected her grievances and her appeals and she then knew about that and filed collateral grievances about the improper rejections? I don't know the answer to that, Your Honor. But we don't know that she knew that system. But what we do know is that she did not present in her declaration any evidence at all that the other avenues were shut down to her. She knew they were there, but she presented no evidence that would raise a dispute of fact. And it was proper for the district court to say in its ruling, Ms. Williams hasn't given me any evidence to refute the ample evidence that the defendants have presented. So there's just no dispute of fact, and on a summary judgment standard, no evidentiary hearing would be required. So in the end, what we're asking is for the judge, the court, rather, not to even reach the exhaustion issue, because before you do anything else in this case, what you should do is reject Ms. Williams' claim of imminent danger and revoke her informal proper status and require her to pay the court's filing fee. Thank you. Hey, this is a nice Southern accent. Thank you. Yeah, but it's East Texas. East Texas. Is it East Texas? I don't think so. Where? Long Beach. Which is it? Long Beach. Long Beach. Long Beach. Oh, yeah. Okay. I figured. Fine. I'm trying to get even without a Southern accent. Well, I can't. I was raised here. So just a couple of quick points. I mean, first, I don't think Ms. Williams was required to continually reattempt to exhaust. For example, in Hubbard, the prisoners filed the complaint. It was never responded to. Filed other complaints on other things, but on the operative one, he didn't hear anything, and that was it. The court didn't say, well, you should have resubmitted it or anything. One was enough, which seems sensible because how many times are you going to require exactly? It's a slippery slope. But if we do find that on appeal, because it's a separate fee, we can then look at the IFP status issue anew, then we'd have to construe, or do we have to construe, the relief that's being sought in the complaint pretty broadly in order to grant IFP status in this case? Because if all she's asking for is the removal of the R designation, I think counsel raises a good point. What really would that do? There's a redressability issue then. Well, as I said, there's civil pro rule 54C, which says basically it doesn't, except in default judgments, it doesn't really matter specifically the relief she asks for. The court should give her the relief she's entitled to. And what she's entitled to is to have the threats of imminent danger removed from her. The other thing is there was a lot of discussion about whether the nexus is met right now. I'd just like to emphasize again, I think the test is whether there was a nexus between what the guards were doing and when Ms. Williams filed for IFP. Because Section 1915A says it's at the commencement of the suit, and then actually later in A it tells you you can take it away. Isn't the G.R.A. marked on that? It's a G. I think it's a problem. Well, Section E tells you when you can dismiss the case. So if it's being prosecuted in, I think, bad faith or a few other things, you can dismiss. That's not revocation of IFP status. The statute specifically provides a single condition in which you can revoke it and not dismiss the case, and that's 1915A. But what if that's not a G? And in no event shall a prisoner bring a civil action or appeal a judgment with three strikes unless he is under imminent danger. What does it mean, or appeal? Okay, so you could bring, so obviously bringing an action includes an appeal. So the reason that's not redundant is because you could be asking for IFP for the first time on appeal. So that explains that. And then opposing counsel is made, is emphasized in Section G that you quoted. The present tense verb is under imminent danger, but the is applies to when you bring the suit. That appeals back to Section A. So this is a one-time determination unless the specific called-out exception in 1915, well, there's also one in A, at the bottom of A. I think it's A3. It says the district court can certify, but if the appeal's in bad faith, then the IFP status can be revoked. That's it. And then it tells you in E when you can actually dismiss the case. So the, you know, I honestly don't think you have discretion over this. I think the statute has laid out the conditions under which the one-time designation can be revoked or the case dismissed, and they don't apply here. There's been no bad faith certification by the district court. So, you know, which makes sense. I mean, it would be problematic if every time somebody comes up on appeal, you're having the equivalent of a mini-trial to decide whether the imminent danger still exists. Well, that's an interesting question. It doesn't mean if we were to say there has to be a, that this applies separately on appeal. If we were to say that, believe me, that doesn't mean a mini-trial by any means. It's like when you go and form a promise, you file an affidavit, then you don't have a mini-trial over the affidavit. Okay. That would be true, I assume, as well. If the issue is you have to still be in imminent danger, there would be an affidavit, which you have in this case. Yes. And so even if it applies separately to the appeal, you would satisfy that with the kind of affidavit. There would be no trial. The court would look at an affidavit and say, is this enough from a popular status? I agree with you. We don't want to have a trial over whether you can pay a filing fee. Right. But the first question is a legitimate question, I think. Do you need a separate showing of imminent danger, which, again, I would assume, would involve reexamining what was done below and what was alleged and what was alleged to be a continuing one. Right. I don't think until now that defendants have challenged the district court's grant of IFP before. They were just arguing that it doesn't matter, you need to see whether the imminent danger exception applies under Ms. Williams' current circumstances. We think we meet that anyway, but it doesn't matter because we think IFP is determined, minus those couple of exceptions in the statute that don't apply, when it is first granted at the commencement of the suit. Just the one other thing to point, you know, there's really only two people who know what happened here. There's Ms. Williams and then there's Officer Cobb. And, you know, there's no affidavit from Officer Cobb saying, Ms. Williams never tried to file a grievance with me, like she says. If this gets remanded, as I think it does, I or Ms. Williams, I would certainly want to find out from Officer Cobb himself, have him either affirm or deny what she's saying. I mean, the critical person has been omitted here. Officer Cobb has said nothing. You know, it would be nice if we could get to the merits of cases. Probably the whole trial, the merits of this case, would take far less time than the litigation we've had and are having over whether she could get a formal popular statement, whether it should be dismissed on exhaustion. You know, you can litigate all those things and we could have three trials over all of this. I suspect in the merits she wouldn't do too well, but I don't know. But I don't think it would be a very long trial. We've made just a big, big, well, issue is not the word, but we've made a huge construct on habeas. And a lot of it is brought about by the barriers that are put in the path of the person who wants to bring their grievance to court. And so I know I talk too much, but when I started, we'd get these habeas petitions, take care of them, and that was it. But then we developed the magistrate system. The barriers became more complex. The labyrinths were set up. And now we have, which is fine, you know, we have more magistrate judges than we probably have district judges. And complexities are added so that a great writ becomes a great joke. That's my speech. I'm not fooling you. It's so much easier just to have these matters come to the courts. The courts take care of them. And anyway. Let me tell you what I was talking about. A thousand habeas petitions are filed. More than that, but I'm sure. Last time I checked, you get a thousand filed in L.A. in the central district and maybe one or two. Then the attorney general of California used that as a great opportunity to beat up the federal court system as interfering with the proper administration of justice. Okay. Now, we have two issues, as I said at the beginning. What do you need to get the form of office? And that should not be turned into a massive trial. I mean, we can do that fairly simply. You're going to go back on exhaustion if you prevail. And the thing, it does both legitimate issues. But I hope neither the question of informal property nor exhaustion gets turned into a massive trial by itself. You've had an exhaustion hearing. We'll either say it's satisfactory or we'll say it wasn't enough to justify dismissal. Then you go back and whatever you do in the district court, it's up to the district court and to review. They can decide whether they want to have another exhaustion hearing, whether they want to have witnesses, whether they want to get more affidavits, whether they can go ahead and get to the merits. I don't think that's anything that concerns us particularly. So you all decide whether you want to have a nice six-month trial over exhaustion or a three-day trial over or maybe a one-day trial over the merits. Yes, this is true. But, you know, your two issues are both legitimate issues for us and they were both well presented by everybody involved. And thank you. Yeah, thank you. Thank you very much. And the more time we spend, the more people are involved, the work product of the country increases, the more employees we have. Well, we're familiar with the Duke. I know. So come back any time. You'll hear lots more stories. We appreciate immensely having the UCLA Law School come here today. Thank you. Is the professor here? Is that the gentleman there? He's the supervising partner. Oh, he's supervising. Where's the professor? She's there? No, the professor is. I don't know where the professor is. Well, let's call her the professor. I'm just a lowly law clerk. All right. Thank you. Thank you very much. Remember my words about women running the country 20 years? You said I should come. Well, I'm getting good service.
judges: Pregerson, Reinhardt, Nguyen